UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STEFANO PICCIOTTO, JUDITH PICCIOTTO, MELITA PICCIOTTO, ATHENA PICCIOTTO, and FOREIGN CENTER, INC., | ) ) ) ) ) | |
| Plaintiffs | ) | |
| v. | ) | C.A. No. 05 10901 DPW |
| CONTINENTAL CASUALTY COMPANY, GREAT NORTHERN INSURANCE COMPANY, HARTFORD INSURANCE COMPANY and TWIN CITY FIRE INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants | ) | |

**AFFIDAVIT OF STEFANO PICCIOTTO
IN SUPPORT OF PLINTIFF"S RESPONSE TO NOTICE OF RELATED CIVIL
CASES BY CONTINENTAL CAUSUALTY COMPANY**

I, Stefano Picciotto, hereby depose and state:

1.  I am a plaintiff in the above-captioned case.

2.  May 2, 2005, I filled out the local civil category sheet in the above-captioned case, asking, at item 4, "Has a prior action between the **same parties** and based on the **same claim** ever been filed in this court?" (all emphasis mine)

3.  I answered "No" because I did not believe that the case I was filing was "related to" the cases currently stayed and pending in front of Judge Gertner:

    A.  The case entitled *Stefano Picciotto et al v. Jeffery Schreiber* et al (case no. 00-11506 NG) has different defendants and is a complaint for breach of fiduciary duty to me as a creditor in the bankruptcy proceedings entitled IN RE: Salem Suede 96-13184.

    B.  The case entitled *Stefano Picciotto et al v. Albert P. Zabin et al* (case No. 00-CV-12421-NG), again, has different defendants, and is a case for violation of my civil rights on the part of state actors, acting under the color of state law, during a proceeding in a state court.

4.    The instant case is against <u>different parties</u> and for <u>different torts</u> (e.g., tortious interference with a contract). As such, I believe it is not the same "subject matter" and that was my reason for not believing that the cases were related.

5.    My belief is further grounded in the fact that Judge Keeton was the judge that was randomly assigned to preside over the interlocutory appeals that were generated in said case entitled *In Re: Salem Suede* case No.96-13184-JNF), and the adversary proceeding of *Stefano Picciotto et al v. Travelers Indemnity Company* (No. 96-1298-JNF), U.S. Bankruptcy Court, Boston, Massachusetts.

6.    The U.S, District Court assigned case no. 96-12633-REK to the interlocutory appeals, and Judge Keeton made decisions and issued orders in that case. There were additional interlocutory appeals involving me against the Travelers which were ruled upon by Judge Keeton.

7.    When the case of *Stefano Picciotto et al v. Jeffery Schreiber et al* (case No. 00-11506 NG), was filed, the clerk determined that, despite the shared backgrounds of the plaintiffs, since the case was against different defendants and/or a different cause of action, the case was not directly related to the proceedings of the Travelers, and, for that reason, a new judge (Judge Gertner), was assigned.

8.    The above not withstanding, Judge Gertner has bias against me. Judge Gertner has a social relationship with one of the parties in my cases before her. As such, she should have recused herself from those cases.

9.    September 7, 2001, the First Circuit Court of Appeals vacated the decision and order Judge Gertner had rendered against me in the actions before her (see Attachment A).

10.    April 13, 2004, after the Appeals Court vacated Judge Gertner's Order, Judge Gertner held a status conference. At that status conference, I specifically requested that Judge Gertner allow me to have a stenographic record of the proceedings. Judge Gertner denied my request.

11.    At said status conference, I informed Judge Gertner that I was aware of her social relationship with one of the parties to the litigation, and that I noted her bias against me. I informed Judge Gertner that once the stay was lifted, I would be moving, pursuant to 28 U.S.C. 144 and 28. U.S.C. 455(a), for her recusal from my cases on account of her bias and prejudice. I further informed Judge Gertner that my motion would be accompanied by an affidavit of bias and prejudice, together with and affidavit of good faith on the part of the affiant. Moreover, I stated to Judge Gertner that

since I was representing myself, the affidavit of good faith of the attorney representing the affiant would also be presented by me.

12. I explained to Judge Gertner that the The Supreme Court of the Untied States has protected litigants who find themselves before a judge with bias and prejudice against a party to the litigation by ruling, "It is explicit declaration that, upon the making and filing of the affidavit, the judge against whom it is directed shall proceed no further therein . .. "; *E.G. Berger v. United States*, 255 U.S. 22, 41 S. Ct. 230, 65 L.Ed. 481 (1921), at 36.

13. At said hearing Judge Gertner did not deny her bias against me, nor did she deny her social relationship with one of the parties to the litigation.

14. As a final matter, even though Continental Casualty Company is trying to prejudice this Court against me by painting me as litigious. I would like to inform the Court that I was not responsible for the interpleader action and the cases that have spawned from the conduct of the state actors through that interpleader action.

15. According to Attorney Dana Casher (who was the attorney representing me both in the bankruptcy court proceedings and in the state court interpleader action), the reason the interpleader action occurred, was due to the unreasonable conduct of the attorney lienholders who sought to have the entire 9 million dollar settlement (see the last paragraph of Attachment B, which states, "The Picciottos never refused to pay their former attorneys a fair fee for the services rendered. It was the attorneys' rapacious demands that led to the lawsuit and trial.") Attorney Casher further stated that the conduct of the Attorney lienholders was "a sad example of ego and avarice run amok" that ". . . was a shame on the legal profession." (Attachment B)

16. Attorney Casher has stated under the pains an penalties of perjury, "That lawsuit resulted from the [Picciottos'] dispute with the attorneys who had represented them prior to [Attorney Casher'] seeking to take the entire 9 million dollar settlement that [Dana Casher] had negotiated on the [Picciottos'] behalf in payment of those prior attorneys' fees." (see item 11 of Attachment C)

17. Attorney James Dilday (who was representing my daughter, Melita and Athena Picciotto as defendants in the interpleader action), has also stated under the pains and penalties of perjury, that the attorney lienholders sought to take the entire 9 million dollar settlement (see lines 15-19 of page 445 of Attorney Dilday's deposition of March 3, 2005, Attachment D).

3

18.    The only thing I did was attempt to defend my property, as the United
       Sates Constitution allows me to do.

19.    However, according to Attorney Casher, the state provided me with a
       tribunal that was tainted by "corruption"(see lines 10, 11, and 12 of page
       87 of the October 26, 2004, deposition testimony of Attorney Casher as
       Attachment E).

Signed under the pains and penalties of perjury this $\stackrel{?}{=}$ / day of September 2005.

Stefano Picciotto

CERTIFICATE OF SERVICE

I, Stefano Picciotto, hereby certify that on this day I
served the foregoing document by sending a copy thereof by first
class mail, postage prepaid, or in hand to all attorneys and pro se
parties of record.

Signed this _____ day of September 2005.

Stefano Picciotto

4

A

# ATTACHMENT

# A

**MANDATE**

# United States Court of Appeals
## For the First Circuit

No. 01-1277

STEFANO PICCIOTTO, ET AL.,

Plaintiffs, Appellants,

v.

JEFFREY A. SCHREIBER; SCHREIBER & ASSOCIATES, P.C.;
RICH INTERNATIONAL, INC.,

Defendants, Appellees.

No. 01-1278

STEFANO PICCIOTTO; JUDITH PICCIOTTO; MELITA PICCIOTTO,

Plaintiffs, Appellants

v.

ALBERT P. ZABIN, ET AL.,

Defendants, Appellees.

Before
Boudin, _Chief Judge,_
Selya and Lipez, _Circuit Judges._

### JUDGMENT
**Entered:   September 7, 2001**

We have reviewed the records and briefs in these appeals.
Given the overlap between the issues raised in these suits and
those which are presently pending in _Zabin_ v. _Picciotto_, No. 99-
1594A (Suffolk County Superior Court), we share the district
court's concern that any further action in the federal lawsuits at
this time would waste the time and resources of all concerned.
Indeed, we believe that the factors and balancing test summarized
in _Elmendorf Grafica, Inc._ v. _D.S. America (East), Inc._, 48 F.3d
46, 50 (1st Cir. 1995) (discussing the abstention doctrine first
outlined in _Colorado River Conserv. Dist._ v. _United States_, 424

U.S. 800, 818-20 (1976), militate so strongly in favor of staying these proceedings until the state court action is concluded that abstention is required as a matter of law, see Cruz v. Melecio, 204 F.3d 14, 22-25 & n. 7 (1st Cir. 2000); Lundborg v. Phoenix Leasing, Inc., 91 F.3d 265, 272-74 (1st Cir. 1996).

We therefore vacate the judgments and remand with instructions that these cases be stayed pending final resolution of the state court litigation. As the district court has not yet finalized its sanctions orders, we express no opinion on the appropriateness of sanctions in these cases.

So ordered.

By the Court:

JANICE M. O'NEIL

Janice O'Neil, Acting Clerk.

Certified Copies: Judge Nancy Gertner
                  Tony Anastas - Clerk of Court

CC: Stefano  Picciotto
    Judith   Picciotto
    Melita   Picciotto
    Michael J. Stone, Esq.
    Steven A. Baddour, Esq.
    Richard W. Renehan, Esq.
    Lisa Ann Yee, Esq.
    Alexander G Gray.

E

# ATTACHMENT

# B

Copy of Excerpt 4520, Vol 30, No. 31 Massachusetts Lawyers Weekly, Dated April 1, 2002. Currently stored at Social Law Library, 34 Tremont St., Boston, MA — Y current issues

Richard Katows from Law Librarian

## LETTERS

# Benefits Of Structured Settleme

To the Editor:

It was surprising for me to read the comments by Alexander Bove and Melissa Langa with regard to structured settlements in special needs trusts in your March 11 issue ("Protecting Personal-Injury Awards With SNTs").

If the trust is properly drawn up, there should be no problem paying estate taxes when a structured settlement is used to fund the Special Needs Trust. I should know. I have been doing this for years. Additionally, it should also be noted that of the top 12 settlements of 2001, nine were personal-injury settlements; and all nine were structured.

The estate tax on future periodic payments is handled quite easily, and can be handled in any number of ways. First, enough cash could be left in the trust to

# 'Monster Case' Was No Victory

To the Editor:

On Feb. 18 you published an article entitled "The Monster Malpractice Case" in which you portrayed the attorney parties involved as "victorious." Indeed, the overall tone of the article showed approbation for the attorneys and scorn for the clients. However, your article omitted certain key facts, which, I believe, change the picture dramatically.

For example: The $9-million settlement was negotiated within days of our exposure of bankruptcy fraud and briefing of insurance coverage, with critical discovery and a short trial date imminent. The attorneys sought the entire $9-million settlement for themselves claiming entitlements to full percentage shares based on contingent-fee agreements, which were never completed. The attorneys asserted Chapter 93A, §11 claims against their former clients, including a 16-year-old girl. The attorneys opposed the clients receiving any portion of their settlement as a litigation strategy to coerce the clients to pay their disputed fees, although the attorneys knew that the clients had been living in poverty for years.

Each of the attorneys had several attorneys representing them funded by their insurers, while, due to the court's retention of their settlement, the six clients could not even afford to pay one attorney on a current basis to defend their right to their settlement. Halfway through the trial, the attorneys were still demanding over $1 million more than they were awarded.

The Monster Malpractice Case was filed by the insurance company as an interpleader specifically because of the attorneys' interference with payment of the settlement to the clients — it was not filed by the Picciottos. If you superimpose those facts on the article as published, it is clear that The Monster Malpractice Case was far from a victory. Rather, it was a sad example of ego and avarice run amok.

Certainly, attorneys should be paid for loyal and competent services rendered. When the clients hired me, however, they had been abandoned, unrepresented in a complex and contentious bankruptcy matter. Through hard work, against tremendous odds, the clients and I, working together, exposed the fraud and saved that case, only to become embroiled in "The Monster." Had the attorneys acted reasonably and ethically, "The Monster" would never have happened. The tremendous squandering of public resources would have been avoided. And the sacrifices that my clients and I have had to make would have been relieved in 1999.

The Picciottos never refused to pay their former attorneys a fair fee for the services rendered. It was the attorneys' rapacious demands that led to the lawsuit and trial. "The Monster" was no victory — it was a shame on the legal profession.

Dana E. Casher
Boston

*The writer represented the Picciottos.*

# ATTACHMENT

# C

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss:                              SUPERIOR COURT DEPT.
                                          C.A. No.

*************************************
                                    *
KRULEWICH, CASHER, P.C.,            *
            Plaintiff               *
                                    *
v.                                  *
                                    *
STEFANO PICCIOTTO, JUDITH           *
PICCIOTTO, MELITA PICCIOTTO,        *
ATHENA PICCIOTTO, FOREIGN           *
CAR CENTER, INC. and JUAN NUNEZ,    *
            Defendants              *
                                    *
*************************************

### AFFIDAVIT OF DANA E. CASHER
### IN SUPPORT OF EX PARTE MOTION
### FOR REAL ESTATE ATTACHMENT

Dana E. Casher, being duly sworn, hereby deposes and states:

1.   I am one of the two principals of the Plaintiff corporation.

2.   I make this affidavit on my own personal knowledge.

3.   As set forth in the contract and billings attached to the Complaint, the Defendants owe the Plaintiff $949,537.55 plus the interest which has accrued on the charges as far back as 2000, court costs and attorneys fees.

4.   I am very familiar with the Defendants, having represented them almost exclusively from June, 1998 through 2002.

5.   None of the Picciottos are employed.  Their only assets are such interest as they have in their home and their interest in the monies which are presently under the control of Judge Sikora in the Superior Court and a judgment recently obtained for them by George Richardson in the approximate principal amount of $60,000.

6.   As of last week (although notice was only received today), Judge Sikora declined to permit the Plaintiff a lien against the monies he is holding or to pay any portion of the fees due to the Plaintiff from those monies.  Furthermore, he referenced the continuing accrual of interest on the judgments against the Picciottos which, he states, may exhaust all or substantially all of those funds.

7.    On or about November 5, 2003 I received a telephone call from a woman who claimed to be representing a lender who was refinancing the Picciotto's mortgage on their real estate.  She was inquiring about the discharge of a loan which I had facilitated back in 1999 or 2000.  She indicated that the refinance loan was scheduled for prompt closing.

8.    Without immediate security, the Picciottos will never pay the debt that is owed to the Plaintiff.

9.    The defendants have no insurance available to pay this debt.

10.   The Plaintiff represented the Defendants in a huge, complex legal malpractice/fee dispute litigation with upwards of 15 attorneys representing the opposition at any given time.  The matter included a sixty-three day jury trial and over a year of post-trial motions.

11.   That lawsuit resulted from the Defendants' dispute with the attorneys who had represented them prior to the Plaintiff seeking to take the entire nine million dollar settlement that the Plaintiff had negotiated on the Defendants' behalf in payment of those prior attorneys' fees.

12.   There is a substantial likelihood that the Plaintiff will obtain judgment against the Defendants in an amount greatly in excess of the approximately $950,000 principal debt.

13.   Due to the imminent refinance, there is an immediate danger that without the requested security, the Defendants will destroy any equity that they hold in the property at issue.

Signed this 13th day of November, 2003 under the pains and penalties of perjury.

_____
Dana E. Casher

D

# ATTACHMENT

# D

```
                                      Volume:          I
                                      Pages:         117
                                      Exhibits:       10
```

COMMONWEALTH OF MASSACHUSETTS
ESSEX, SS                             SUPERIOR COURT

```
* * * * * * * * * * * * * * *
                              *
MELITA PICCIOTTO,             *
                              *
     Plaintiff,               *    No. ESCV2003-0036A
                              *
v.                            *
                              *
DANA CASHER,                  *
LEONARD KRULEWICH,            *
HELEN KRULEWICH,              *
and KRULEWICH CASHER, PC,     *
                              *
     Defendants               *
                              *
* * * * * * * * * * * * * * *
```

DEPOSITION of **JAMES DILDAY**, a witness called on
behalf of the Plaintiff, taken pursuant to the Massachusetts
Rules of Civil Procedure, before Barbara Milne, a
Professional Court Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, at 418A Lafayette Street,
Salem, Massachusetts, on Thursday, March 3, 2005, commencing
at 2:30 p.m.

William E. Beaupre, 145 Norfolk Ave., Swampscott, MA   01907
                         (781) 598-5286
*************** COMPUTER AIDED TRANSCRIPTION ***********

2

# A P P E A R A N C E S

**MELITA PICCIOTTO**
418A Lafayette Street
Salem, MA  01970
        Pro-Se Plaintiff

**STEPHEN J. DUGGAN, ESQ.**
Lynch & Lynch
45 Bristol Drive
South Easton, MA 02375
(508) 230-2500
        Counsel for the Defendants

1   A   Yes.
2   Q   Now, on that day, when you heard those
3       arguments, did you come to any conclusions
4       about -- about how Attorney Casher had handled
5       my case or handled the settlement on my behalf?
6           MR. DUGGAN: Object to the form.
7           THE WITNESS: No. No, I didn't.
8   Q   Did you know Attorney Casher before February of
9       2000?
10  A   No.
11  Q   You didn't know a mutual friend of hers?
12          MR. DUGGAN: Objection.
13          THE WITNESS: I may have. You know, I
14      think I may have met her before, but
15      whether we were friendly, I don't know.
16      Let me rephrase that. I didn't have any
17      professional relationship with her, and if
18      I had met her prior to that time, we didn't
19      have any real relationship, social or
20      professional.
21  Q   Did you know, Mr. Dilday, that Attorney Zabin
22      brought a claim against both my sister and
23      myself for violating 93A?
24  A   I don't remember.
                        -44-

1   Q   Do you remember anything about him bringing a
2       claim against my sister and myself for entering
3       into a civil conspiracy with my parents and
4       Juan Nunez to deprive him of fees?
5   A   I vaguely remember that Al did that. I don't
6       remember the details, but I do remember that
7       there was something about a civil conspiracy.
8   Q   Do you recall that, pretrial, Attorney Zabin
9       was seeking to recover $3.5 million from the $9
10      million settlement?
11  A   I don't remember how much, but he was asking
12      for a lot.
13  Q   Do you recall Attorney Gilleran seeking to
14      recover 35 percent of the 9 million?
15  A   I don't recall the specific dollar amount, I
16      mean percentage, that Gilleran was asking for,
17      but I do remember that based upon what the
18      attorneys were asking, there would have been
19      nothing left in the settlement.
20  Q   Do you recall that the attorneys were arguing
21      that -- both Zabin and Gilleran were arguing
22      that my sister and I -- the apportionment to my
23      sister and myself was done in bad faith and
24      that we were doing it in order to deprive them
                        -45-

1       of fees?
2   A   Yes.
3   Q   Do you know what a 93A claim is?
4   A   Yes.
5   Q   Do you know what Section 2A of 93A is?
6   A   I'd have to see it.
7   Q   Do you know what Section 2C is?
8   A   I see them, and I read them, but right now I'd
9       have to read them and look at them. I don't do
10      a whole lot of 93A work. I've done 93A claims
11      in the past.
12  Q   Actually, I'm going to go back for a second to
13      the other question about Zabin and Gilleran.
14      You testified that you were aware that they
15      were alleging that the apportionment of money
16      was done after the fact, in bad faith, in order
17      to deprive them of fees, correct?
18  A   Yes.
19  Q   Now, had the apportionment been made in the
20      settlement agreement itself, could they have
21      made the argument that it was done after the
22      fact, in bad faith, in order to deprive them of
23      fees?
24          MR. DUGGAN: Objection.
                        -46-

1           THE WITNESS: They could have made
2       that argument.
3   Q   That it was done after the fact?
4           MR. DUGGAN: Objection.
5           THE WITNESS: Well, they could have
6       made it.
7   Q   But it would have been --
8   A   Unfounded.
9   Q   Unfounded. Are you aware that pursuant to
10      Section 2C of 93A, that the attorney general
11      makes -- may make rules or regulations defining
12      what is unfair in trade or commerce?
13  A   Yes.
14  Q   Are you aware that pursuant to its statutory
15      power, the attorney general promulgated
16      regulations, specifically 940 CMR 3.16, Section
17      3?
18  A   Yeah, those are the rules that control unfair
19      and deceptive trade practices.
20  Q   Could you describe this document for me?
21  A   It's an affidavit in support of the Picciottos'
22      claims of the General Law Chapter 93A, and it's
23      filed in the lawsuit of Albert Zabin, Esquire,
24      et al, v. Stefano Picciotto, et al.
                        -47-

NOTES:

**MINIDEP™**

E

# ATTACHMENT

# E

## DEPOSITION OF: **DANA CASHER**

Volume:      I

Pages:      114
Exhibits:      5

COMMONWEALTH OF MASSACHUSETTS
ESSEX, SS                    SUPERIOR COURT

* * * * * * * * * * * * * *
                    *
MELITA PICCIOTTO,              *
                    *
   Plaintiff,      *    No. ESCV2003-0036A
                    *
v.                  *
                    *
DANA CASHER,                *
LEONARD KRULEWICH,          *
HELEN KRULEWICH,            *
and KRULEWICH CASHER, PC,    *
                    *
   Defendants        *
                    *
* * * * * * * * * * * * * * *

        DEPOSITION of DANA CASHER, a witness called on behalf
of the Plaintiff, taken pursuant to the Massachusetts Rules
of Civil Procedure, before Barbara Milne, a Professional
Court Reporter and Notary Public, in and for the Commonwealth
of Massachusetts, at 418A Lafayette Street, Salem,
Massachusetts, on Tuesday, October 26, 2004, commencing at
10:10 a.m.

William E. Beaupre, 145 Norfolk Ave., Swampscott, MA 01907
(781) 598-5286
***************COMPUTER AIDED TRANSCRIPTION ***********

        A P P E A R A N C E S

        MELITA PICCIOTTO
        418A Lafayette Street
        Salem, MA 01970
            Pro-Se Plaintiff

NOTES:

---

STEPHEN J. DUGGAN, ESQ.
Lynch & Lynch
45 Bristol Drive
South Easton, MA 02375
(508) 230-2500
        Counsel for the Defendants William E. Beaupre,    Norfolk
Ave., Swampscott, MA 01907
(781) 598-5286
***************** COMPUTER AIDED TRANSCRIPTION *     *****
                    -2-

        I N D E X

WITNESS            DIRECT  CROSS  REDIRECT  RECRC

DANA CASHER

(By Ms. Picciotto)      4

        E X H I B I T S

NO.  DESCRIPTION                    PAGE

1  Rule 3:07 Massachusetts Rules
   of Professional Conduct              37

2  Photocopy, "The Massachusetts Lawyer"      86

3  Photocopy, "Lawyer's Weekly"          91

4  Verified Complaint                  101

5  Affidavit of Dana Casher              106
                    -3-

DEPOSITION OF: **DANA CASHER**

1　　in the interpleader action by the F word?
2　A　Quite likely.
3　Q　Any other derogatory epithets?
4　A　Probably.
5　Q　Can you think of any?
6　A　Does it matter?
7　Q　I think it does. That's why I'm asking the
8　　question.
9　A　Not offhand.
10　Q　Why did you do that?
11　　　　　MR. DUGGAN: Objection.
12　　　　　THE WITNESS: In all likelihood, they
13　　angered me or did something that I found
14　　objectionable.
15　Q　Such as?
16　　　　　MR. DUGGAN: Objection.
17　　　　　THE WITNESS: Who are we talking about
18　　here?
19　Q　Any of the attorney lienholders. You can go
20　　through the list of them. You can tell me
21　　which ones you recall angering you
22　　specifically. Whose behavior you found
23　　objectionable.
24　A　The lienholders themselves. I don't recall
　　　　　-84-

1　　specifically.
2　Q　Did you ever refer to Judge Sikora using a four
3　　letter word?
4　A　Probably.
5　Q　Can you think of any behavior that would
6　　inspire that word from you?
7　　　　　MR. DUGGAN: Objection.
8　　　　　THE WITNESS: Lots.
9　Q　What specifically did Judge Sikora do to anger
10　　you?
11　A　Many things.
12　Q　Can you tell me?
13　A　He ordered me to appear for a deposition
14　　without anyone having filed a motion seeking
15　　such an order.
16　Q　Okay.
17　A　And certainly without any notice or opportunity
18　　to be heard. He claimed that I had failed to
19　　do things that I had done.
20　Q　Like what?
21　A　Like offer reasonable alternatives to Stefano's
22　　signing a blanket release of his Social
23　　Security records.
24　Q　Anything else?
　　　　　-85-

1　A　Lots of things. He permitted all of the
2　　opponents to file summary judgment motions on
3　　the same day, and he gave me less time than the
4　　rules allow to oppose them all.
5　Q　Anything else?
6　A　I'm sure there were many, many, many times, but
7　　those are the ones that immediately come to
8　　mind.
9　Q　Have you ever had an interview with a reporter
10　　for a newspaper about a case in which you
11　　represented me?
12　A　An interview? I spoke with a fellow from the
13　　Wall Street Journal. Jeffrey something. It
14　　begins with a K. There was also someone named
15　　Elizabeth something from North Shore, who I
16　　spoke with, but I don't think I was
17　　interviewed.
18　Q　Would you identify this document for me?
19　A　It appears to be a photocopy of an excerpt from
20　　Mass. Lawyers Weekly of February 18th, 2002.
21　　　　　MS. PICCIOTTO: Can we mark this?
22　　　　　*
23　　　　　(Exhibit No. 2. Photocopy, "The
24　　　　　Massachusetts Lawyer," was Marked for
　　　　　-86-

1　　　　　Identification.)
2　　　　　*
3　Q　Did you complain to the reporter about the
4　　conduct of the trial judge in that article?
5　A　Probably.
6　Q　Do you remember telling the reporter that there
7　　was an awful lot of corruption?
8　A　Do I remember that? No. I'm not denying that
9　　I did. I just don't remember it.
10　Q　Did you feel that there was an awful lot of
11　　corruption?
12　A　Yes.
13　Q　Why do you feel that?
14　　　　　MR. DUGGAN: Objection.
15　　　　　THE WITNESS: Well, the biggest tell
16　　for me was that instance where an onerous
17　　court order issued without ever any motion,
18　　notice, hearing being filed. That and
19　　Judge Sikora's inconsistent statements with
20　　regard to his relationship with Mr.
21　　Costello.
22　Q　Anything else?
23　A　Many more subtle factors led to my belief that
24　　there was something more going on than met the
　　　　　-87-

NOTES:

MINUTE Box

DEPOSITION OF: **DANA CASHER**

1     eye.
2   Q   What were those subtle factors?
3   A   They're subtle. They're, you know, eyes
4     meeting. They're the reception received by
5     certain counsel over that of others. It's a
6     personal perception. That's all. I make no
7     bones about the fact that I did not think it
8     was a fair trial. I never did, and I still
9     don't.
10   Q   You told the reporter that the brotherhood
11     extended as far as the bench. What did you
12     mean by that?
13   A   Which part is unclear to you?
14   Q   What brotherhood?
15   A   The old boy network, as it is frequently
16     called.
17   Q   What is the old boy network?
18   A   It is middle aged to older men who went to
19     school together, socialize together, or
20     participate in extracurricular activities
21     together, who make life easier for one another,
22     in more or less appropriate ways.
23   Q   And it was your opinion that Judge Sikora was
24     part of this network?

-88-

1   A   Circumstances suggested to me that he was
2     involved in it, yes.
3   Q   What circumstances made you feel that he was
4     part of the old boy network?
5   A   The instances that I've pointed to.
6   Q   Did you state to any of your clients in the
7     interpleader action that Judge Sikora was
8     crooked?
9   A   I don't know if I used that word, but I may
10     have.
11   Q   Do you know why you would have said that?
12       MR. DUGGAN: Objection.
13       THE WITNESS: For the same reasons
14     I've articulated.
15   Q   Did you ever tell your clients that the fix was
16     in?
17   A   I don't recall using such words, but I may
18     have.
19   Q   Did you feel that the fix was in?
20       MR. DUGGAN: Objection.
21       THE WITNESS: From time to time, yes.
22   Q   And by that, you meant or would have meant
23     what?
24   A   That no matter what I did, the result was

-89-

1     predetermined.
2   Q   Did you complain to any newspaper about the
3     attorney lienholders?
4   A   I spoke to the Jeffrey guy from the Wall Street
5     Journal. I spoke with somebody named Elizabeth
6     something from North Shore Sunday. And I spoke
7     with this Gene Greeley person. I don't know
8     what you mean by complaining. Did I criticize
9     them? Certainly.
10   Q   What do you remember saying?
11   A   I don't remember specifically.
12   Q   Do you remember the gist of what you would have
13     said?
14       MR. DUGGAN: Objection.
15   Q   The general conversation, your general
16     impressions of that?
17   A   I don't. I mean, with the Wall Street Journal
18     guy, basically I gave him a background of the
19     case. Frankly, it was too long ago. I don't
20     recall. The articles themselves would be the
21     best information.
22   Q   Can you identify this document for the record?
23   A   It's a letter to the editor that I wrote to
24     Lawyer's Weekly.

-90-

1       MS. PICCIOTTO: Can we make that an
2     exhibit?
3       *
4       (Exhibit No. 3, Photocopy, "Lawyer's
5       Weekly," was Marked for
6       Identification.)
7       *
8   Q   Would you please read that letter into the
9     record?
10       MR. DUGGAN: No, no.
11       THE WITNESS: It's in the record.
12   Q   Do you want to read it to yourself to refresh
13     your memory as to what you said?
14   A   Okay.
15   Q   Are you representations in that letter true and
16     accurate statements?
17       MR. DUGGAN: Objection.
18       THE WITNESS: I believe so.
19   Q   Did you see jurors come to the trial, sitting
20     in the jury box, dressed in Halloween costumes?
21   A   Yes.
22   Q   Did you see attorneys for the attorney
23     lienholders pass out candy and joke bumper
24     stickers to jurors?

-91-

TES: